IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 18, 2017 at Knoxville

**STATE OF TENNESSEE v. JOHN ALFRED WATERS**

**Appeal from the Criminal Court for Davidson County**
**No. 2014-D-2991          J. Randall Wyatt, Jr., Judge**

_____

**No. M2016-00522-CCA-R3-CD**

_____

The Defendant, John Alfred Waters, appeals as of right from his convictions for aggravated assault, violation of an order of protection, and attempted aggravated burglary. The Defendant contends (1) that there was insufficient evidence to support his convictions for aggravated assault as charged in counts 6, 7, and 8; (2) that the trial court erred when it admitted evidence of the Defendant's previous conviction for violating an order of protection; and (3) that the trial court erred in allowing a police officer to testify that one of the victims was the "most terrified" victim he had ever seen because such evidence was irrelevant and unduly prejudicial. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Emma Rae Tennent (on appeal); and Emily Herbert and Ellen Forrester (at trial), Nashville, Tennessee for the Defendant, John Alfred Waters.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; Amy Hunter and Jeffrey Jackson Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arose after the Defendant twice entered an apartment complex on Rosa L. Parks Boulevard in Nashville, Tennessee, where his ex-girlfriend lived. The Davidson County Grand Jury charged the Defendant with eight counts of aggravated assault; two counts of violating an order of protection; one count of attempted burglary; and one count of aggravated stalking. Specifically, the Defendant was accused of the following crimes:

**Count 1:** Aggravated Assault against Annette Hill on June 23, 2014, by violating an order of protection.

**Court 2:** Violation of an Order of Protection by having contact with Annette Hill on June 23, 2014.

**Court 3:** Aggravated Assault against Kimberly Simpson on June 23, 2014, by use or display of a deadly weapon.

**Count 4:** Aggravated Assault against Annette Hill on June 23, 2014, by use or display of a deadly weapon.

**Count 5:** Attempted Aggravated Burglary of Annette Hill's home on June 23, 2014.

**Count 6:** Aggravated Assault against Annette Hill on June 24, 2014, by use or display of a deadly weapon.

**Count 7:** Aggravated Assault against Kimberly Simpson on June 24, 2014, by use or display of a deadly weapon.

**Count 8:** Aggravated Assault against Ronda Armstrong on June 24, 2014, by use or display of a deadly weapon.

**Count 9:** Aggravated Assault against Officer Troy Loewen on June 24, 2014, by use or display of a deadly weapon.

**Count 10:** Aggravated Assault against Sergeant Terrance Demarest on June 24, 2014, by use or display of a deadly weapon.

**Count 11:** Violation of an Order of Protection by having contact with Annette Hill on June 24, 2014.

**Count 12:** Aggravated Stalking of Annette Hill on June 23 and 24, 2014.

See Tenn. Code Ann. §§ 39-12-101; -13-102, -13-113,-13-402; -14-403; -17-315. Prior to trial, the Defendant pled guilty to Count 11 for violating an order of protection and

Count 12 for aggravated stalking. The case proceeded to a jury trial on September 8, 2015, on the remaining ten counts.

## I. Incident One

Kimberly Simpson testified that on June 23, 2014, she was involved in an incident at an apartment complex on Rosa L. Parks Boulevard. She explained that she called the police because she was "assaulted running in [her] building." Ms. Simpson identified the Defendant as the man who attacked her that day at the apartment complex.

She stated that she had been at a baseball game, and a friend had driven her home. Ms. Simpson testified that she "always [ran] into her building . . . [b]ecause she lived[ed] all the way at the top, so [she ran] all the way up the stairs." She stated that as she was running to her building, she noticed "[a] guy walking down the sidewalk with a long silver thing and that was out of the ordinary in [her] building[.]" When she ran back to see what was going on, she saw "a guy with a white t-shirt on[,]" who "was coming down the sidewalk[.]" According to Ms. Simpson, the man "was already behind" her, and she "could hear his shoes and [his] laughing and saying, . . . 'Ah, ha, I got you now b---h." Ms. Simpson also testified that the man said, "I'm fixin' to kill you[r] a-s." She explained that when she "turned around[,]" she "had her hand up because . . . he was swinging [the thing in his hand] and [she] put [her] arm up . . . and started screaming." She stated that she believed that this man was "trying to kill" her and that she "had to hit him. [She] hit him two, two or three times and knocked him over." She claimed that she blocked the swing from the man, and that defending herself "was how she got [the] scar on her arm[.]" She further explained that when she

> blocked the swing [she] put [her] arm up . . . because he was swinging too fast and [she] put [her] arm up . . . and he looked at [her] and [she] just punched him. [She] just punched him and knocked him over . . . the rail – so [she] could get to the step, [she] knocked him over the rail and then [they] . . . had eye-to-eye contact and when he looked at [her], he looked [as if he] got the wrong person and then he continued to go on.

She testified that at that point, she recognized the man as the Defendant because she had previously "seen him in the building." She stated that once they made eye contact, the Defendant continued up the stairs to the second level of the apartment complex where Ms. Annette Hill lived. Ms. Simpson claimed that she observed the Defendant approach Ms. Hill's door, and using "the thing that he attacked [Ms. Simpson] with[,]" he tried "to get into [Ms. Hill's] apartment." She explained that the "thing" was "a long thing with a hook on it and it had like a hammer at the end, like a little size of a hammer at the end of it." She said that it was made of "steel" or "metal[.]" She testified

-3-

that after observing him run to Ms. Hill's apartment door, the Defendant took "the hook and he was just prying and he was trying to get in [Ms. Hill's apartment], but he couldn't get it, so he was still trying, he was kicking it and everything. He couldn't get in." Ms. Simpson testified that she called the police and

> when [the Defendant] heard [her] talking to the police he stopped working on [Ms. Hill's] door and then he started taking his clothes off and [Ms. Simpson told] the police that he [was] taking off his clothes. [The Defendant was] getting naked and then . . . he went down the steps . . . he went to the left and came back and he didn't have nothing on and then he went to the right and [Ms. Simpson] didn't see him anymore.

When asked how she felt during this time, Ms. Simpson testified that she "feared where [she] lived" and that she "feared for [her] life." She further testified that she "couldn't sleep. [She] couldn't eat, nothing, and [she had] never feared anything in her life[.]" She stated that the police officers "showed up . . . three or four minutes later" and that she informed the officers "which way [the Defendant] went."

Ms. Simpson was shown a photograph of the apartment complex on Rosa L. Parks Boulevard. She identified the stairwell where her altercation with the Defendant occurred and "the rail where [she] knocked him over[.]" She confirmed that there were lights at the apartment complex, explaining that the lights "come on at eight o'clock[,]" that the lights were on during the incident with the Defendant, and that she had no problem seeing and identifying the Defendant as he was attacking her. Ms. Simpson averred that she did not "take a warrant out on" the Defendant because she "was angry and knew that they would let him out, so – if they gave him something, they wasn't going to catch him."

On cross-examination, Ms. Simpson asserted that when she arrived at her apartment on the evening of June 23, 2014, she was with one of her friends, Jermaine Chamberlain. She agreed that Mr. Chamberlain remained in his car so that he could make sure she entered her apartment safely. Ms. Simpson testified that she had run to the stairs before she walked back to the sidewalk to see "what [was] going on[,]" indicating that it was abnormal "for somebody to be walking around with a stick in [the] apartment complex." She agreed it was at this point that the Defendant "came running at" her, that he was carrying a "long thing with a hook like it [had] a hammer on the end of it[,]"that she put her hand up to deflect the Defendant's attempt to strike her with the object, and that she punched him and flipped him over the railing. Ms. Simpson viewed a previously identified photograph of the apartment complex stairwell and indicated where she was standing and where the Defendant was standing when she flipped him over the rail. After

-4-

the Defendant continued to run up the stairwell, Ms. Simpson called 911 from Mr. Chamberlain's car.

Also, on cross-examination, Ms. Simpson was questioned about the content of her 911 call. When asked if she recalled telling the 911 operator that the Defendant "dropped the object that he had in his hand in the breezeway[,]" she responded, "No." Counsel for the defense then read the following portion of the 911 transcript, which appeared to contradict Ms. Simpson's assertion:

> They are gray blue jeans and he got a hammer, I don't know what that is laying in our breezeway, but whatever it, whatever he had in his hand, he, you know, when he was trying to attack me it fell down, so it is still laying right there. I don't know what that is laying there though.

Ms. Simpson agreed that Ms. Hill never came outside her apartment during this first incident with the Defendant and that Ms. Hill did not leave her apartment until the police arrived at the apartment complex. She agreed that the police officers took Ms. Hill to the police station and that Ms. Simpson left the complex with her daughter. Ms. Simpson averred that before leaving the complex, she stood outside talking with other apartment residents about what had occurred. Ms. Simpson affirmed that she left the apartment complex with the intention of "taking out a warrant" on the Defendant, but she decided not to do so.

Ms. Annette Hill testified that on June 23, 2014, she was living at an apartment complex on Rosa L. Parks Boulevard. She asserted that she knew the Defendant and that she had dated him previously for approximately three years, but she had ended her relationship with him. Ms. Hill testified that on the morning of June 23, 2014, she was in court all day because the Defendant had violated an order of protection that she had against him. Ms. Hill stated that the Defendant pled guilty to violating the order of protection and that his sentence did not involve jail time. She explained that she was upset about his sentence and stated that she "cried." She said that she was worried "because each time [the Defendant] got out[,] he always [came]." Ms. Hill testified that following the day in court, she was exhausted and went to bed at 8:00 p.m. that night. She stated that her bedroom was located at the back of her apartment and that it was difficult for her to hear people knocking on her door. At some point that evening, she received a phone call from a neighbor, Debra Holt. In response to this phone call, Ms. Hill testified that she "got up, went to the door[,] and [she] couldn't get out." She said that "the police had to let [her] out" of her apartment. She stated that after she got out of her apartment, Officer Troy Loewen, with the Metro Nashville Police Department, took her downtown to assist the officers in taking out a warrant for the Defendant.

Ms. Hill also testified that she was grateful to Ms. Simpson. She was afraid that the Defendant would have gotten into her apartment and that "he probably would have killed [her]" had Ms. Simpson not called the police. Ms. Hill identified a document as the order of protection that she had against the Defendant. She agreed that she got the order of protection on June 4, 2014, and asserted that both her signature and the Defendant's signature were on the document. The order of protection was entered into evidence.

Ms. Debra Holt testified that she had resided at an apartment complex on Rosa L. Park Boulevard and that she recalled incidents that occurred on June 23, 2014, and one in the early morning of June 24, 2014. Regarding the incident on June 23, 2014, Ms. Holt said the following:

> I was in my apartment and I heard a lot of noise and something hit against the wall, so I came out to see what was going on and as I, there was two apartments, mine and the other one, and then we go through a little breezeway out onto the landing outside, when I stepped out I heard the noise and turned around and looked up and that is when I saw [the Defendant] trying to get into [Ms. Hill's] apartment.

Ms. Holt explained that the Defendant was "banging on the handle" of Ms. Hill's apartment door and that he was trying "to pop the door open." She stated that once she saw the Defendant attempting to break into Ms. Hill's apartment she "ran back in [her] apartment and dialed 911." She said that while she was outside, she saw Ms. Simpson, who "was the one that was pointing up telling me to look up." She said that she saw the Defendant holding "some kind of tool" that was "maybe a foot, a foot and a half long, one end had a hammer" and "the other side looked like a crowbar." Ms. Holt testified that police officers arrived at the apartment complex and that Ms. Hill left with the officers. Ms. Holt said that she observed Ms. Hill's apartment door after the first incident. According to Ms. Holt, the door was damaged and "it had a lot of dents and you could see where parts of the metal [were] . . . misshaped."

Officer William Holls, "a FLEX officer with the North precinct[,]" testified that he was a patrol officer in Nashville on June 23 and 24, 2014. He explained that he responded to a domestic disturbance call at an apartment complex on Rosa L. Parks Boulevard. He explained that when he arrived on the scene, Ms. Simpson was "very distraught" and was "saying he is back here, he is back here[.]" He explained that he and other police officers searched the area for the Defendant, but they were unable to find him. He stated that he went to Ms. Hill's apartment, inspected her door, and saw that "there was damage to the door." He spoke to Ms. Hill through the door and asked her to let him in; however, she had "difficulty getting the door open due to the damage to the

door." He explained that he had to "push at the door to get it open" and that he had to "use[] a great deal of force" to do this. Officer Holls said that when he got inside and spoke to Ms. Hill, "[s]he was frightened, concerned, nervous and very fearful."

Officer Loewen testified that he responded to two incidents at an apartment complex on Rosa L. Parks Boulevard on June 23 and 24, 2014. Regarding the first incident, he said that he arrived at the complex around 11:00 p.m. He explained that he "went to that location to relieve an officer that was working second shift" and that he "took over the rest of the incident from there." Officer Loewen explained that he spoke with the officer he was relieving to "get an overview of what had happened[,]" and then he "spoke with Ms. Hill and got a general idea of what had happened." Officer Loewen stated that he took Ms. Hill to the "Criminal Justice Center" so that she could either "obtain[] a warrant or an order of protection[.]" He did not recall which action Ms. Hill took "because it had been a while."

He said that he escorted Ms. Hill back to the apartment complex and "asked her if she needed any more help." He said that she asked him to "stick around because she was, at this point she was clearly, she was terrified. In my experience I have never seen anybody this . . ." After this comment, counsel for the Defendant objected to "the relevance of what [Officer Loewen's] experience [was] about" because it was "not necessary." The trial court overruled the objection and stated that Officer Loewen could testify about "how she appeared" and her "demeanor." Officer Loewen continued, "[Ms. Hill] was terrified. I have been to a lot of domestics and sad situations, but I have never seen a victim as terrified as she was. She asked repeatedly that I stick around and stay with her just in case anything happened." He explained that he stayed with her until "she could have a family member come stay with her." Moreover, when asked if he had seen Ms. Hill's front door, Officer Loewen responded that he "noticed there were several dents and marks on the side of her door, near the door handle."

## II. Incident Two

Ms. Simpson also testified about a second incident that occurred "in the early morning hours of June 24, 2014." She testified that she was sitting outside with Ms. Holt and Ms. Ronda Armstrong. She stated that she was sitting outside because she "was scared to go in" her apartment, so the women "stood outside with [her] and [they were] there talking about" the first incident. She stated that while they were sitting in a breezeway in front of the apartment complex, she "heard something dragging. [The Defendant] had something else in his hand that was very long, it was longer than what he first had." When asked what it sounded like, she replied, "Just steel, just dragging against something, he was talking about I'm fixin' to come and kill y'all, you know, and then that is when he raised his hands up and we all just ran, ran right to the . . . two police

-7-

officers there." She described the object in his hand as longer than the object from the previous incident and said that it "had two hooks" on it.

Ms. Simpson stated that after the women ran to the police officers, the Defendant continued to approach the officers and women. She explained that the officers instructed the Defendant to "get down[,]" but that the Defendant "wouldn't get down[,]" and that he "raised the bar at the police." She testified that after the Defendant ignored the police, raised his weapon, and continued to advance on the officers and the women, one of the police officers "tased" the Defendant. When asked how close the Defendant was to the officers when he was tased, she stated that he "was right in front of them[.]"

Ms. Hill stated that Officer Loewen took her back to her apartment complex, after going to the police station. She agreed that she did not feel comfortable being at her apartment alone. She testified that she "asked Officer Loewen to stay" because the officers "didn't catch" the Defendant and she believed that he would "be back." Ms. Hill testified that Officer Loewen and another officer were in the parking lot of her apartment complex "doing paperwork[,]" while she was "hanging out" with Ms. Simpson, Ms. Holt, and Ms. Armstrong. She explained that they were "sitting on the porch on the steps at the front of the apartment." She confirmed that they were in the breezeway on the first level of the complex. Ms. Hill testified that after she had been sitting on the stairs talking with the women for a while, she heard a noise "[l]ike something was dragging." She elaborated that the sound "was like metal[.]" She said that about the time she heard this noise, Ms. Simpson yelled, "[I]t is him." Ms. Hill testified that she turned around and saw the Defendant "with a crowbar in his hand." She said that he "raised [the crowbar] and he kept coming towards us. We ran to the police." Ms. Hill also testified that the Defendant raised the crowbar over his head "like in a baseball position." She further explained that she "got up and ran" and agreed that she "ran out of [her] shoes when she saw [the Defendant]." Ms. Hill then identified a photograph of a pair of shoes on a sidewalk as the shoes that she was wearing that night. She said that she "was scared" when the Defendant walked toward her with the crowbar.

Ms. Hill testified that after she and the three other women ran to the police officers, they were "[p]robably a couple of feet away" from the two officers. Ms. Hill explained that as the Defendant continued advancing toward them, the officers instructed the Defendant to stop. However, the Defendant did not stop advancing, and he was still carrying the crowbar. She confirmed that he "didn't act like he was going to stop." She stated that the Defendant "was pretty close" when the officers "tased him three times." She agreed that the Defendant "[w]as within a few feet" of the officers when they tased him. When asked if she heard the Defendant say anything from the time he approached her in the breezeway until the time he was tased, she replied, "I know I heard him just say, 'If I die you die.'"

Ms. Holt testified that when Ms. Hill returned to the apartment complex with the officer, Ms. Hill "was afraid." Ms. Holt stated that after Ms. Hill returned, "no one wanted to go to their apartment." She also stated that she was with Ms. Hill, Ms. Armstrong, and Ms. Simpson sitting "out on the stoop" outside of the breezeway. She explained that they were "discussing what had happened that day" and that they "felt secure" because two police officers were sitting in their cars in the parking lot. Ms. Holt testified that while the women were sitting on the steps talking, she heard "a clink[,]" "[l]ike metal hitting metal." She stated that she "[she] turned around and Ms. Simpson sa[id], 'who is this clinking this time of night[?]'" Ms. Holt testified that she realized it was the Defendant and said, "It's him." She said that upon realizing the Defendant was moving toward them with "a weapon" they ran down the sidewalk, "[s]traight to the police officers." She explained that they "flew past [the officers] and went behind the cars" and that they were "screaming and hollering." Ms. Holt also stated that "[w]hen [she] first saw [the Defendant] he had passed the metal stairway" and he "was almost to the middle of the breezeway." She stated that at that point, she saw that he had an object in his hand and that he had it "raise[d] in the air[.]" She said that after the women ran to the officers, that the officers got out of their cars and asked, "Who is coming?[,]" and the women indicated that it was the Defendant. When asked how she felt at that point, Ms. Holt replied, "We were scared. . . . I was petrified[.]" She said that as the Defendant continued to approach the women and the police officers that he still had the object "in his hands" and that she was afraid of that object. Ms. Holt testified that at the time she was not sure what the object was, but she believed that it "was some kind of metal something." When asked to explain that happened after the Defendant continued to advance on the group, she said

> We ran around and one of the officers asked [the Defendant] to stop and put down the weapon and [the Defendant] kept walking and [the police officer] asked him again to stop and put down [his] weapon and when [the Defendant] took another step and a half or two then he was tased.

Ms. Holt also testified that she heard the Defendant say, "If he died she was going to die. We were going to die." She said that the Defendant "was talking to [Ms. Hill]. He was looking at her." Ms. Holt said that she "was afraid that in [the Defendant's] pursuit of trying to get [Ms. Hill] that [she, herself] could be hurt in the process, because [Ms. Hill] was sitting right next to [her] in the middle, [their] shoulders were touching." She stated that she believed the Defendant was primarily looking at Ms. Hill but that she was afraid because she "didn't know what was going to happen. [She] didn't know if [the Defendant] was just aiming for her or if he was going to swing[.]"

On cross-examination, Ms. Holt further described the second incident involving the Defendant and said that was he was tased twice. She stated that the officers asked

him to stop moving and put down his weapon but that he kept moving forward. She said that was when he was first tased, and the "second time [she] didn't actually see it, but [she] could see the coils." She said that the second time the Defendant was tased, she thought that he was on the ground but that he was "still trying to move . . . still trying to get up."

Ms. Ronda Armstrong stated that she lived in Nashville and remembered the incident that occurred on June 24, 2014. She explained that the incident involved the police and happened at her apartment complex on Rosa L. Parks Boulevard. She explained that she was sitting outside of the complex with Ms. Hill, Ms. Simpson, and Ms. Holt. When asked to explain what happened as she was sitting there with the other women, she gave the following account:

> [The other women] were talking about something that had happened before I had even gotten there and just in the midst of us talking there was this noise we heard and I think it might have been [Ms. Simpson who] said, "What is the clinging" and she turned around and she said, "He's back," and we all just took off running and at that time the police officer was still outside, because they were there from [before], from the earlier time, and as we were running we ran past the police cars, the police got out, there was a gentleman running with a crowbar in is hand and he was charging trying to get to [Ms. Hill] and she [was] going to the police thinking she [was] going to be safe that way, but he [was] still charging as the police [were] right there.

Ms. Armstrong then identified the Defendant as the man who rushed them with the crowbar. When asked why she ran when she heard the Defendant's approaching, she said that she was "[s]cared." When asked if she heard the Defendant say anything, she replied, "I know for sure he said, . . . if I don't die tonight, I am going to kill you if I don't die tonight." She stated that the Defendant was directing these remarks to Ms. Hill. Ms. Armstrong also explained that she was able to see the Defendant clearly during the incident because there were lights on the apartment building and the area was "well lit." She explained that she had seen the Defendant before "in passing" and that she "knew of" Ms. Hill because they both lived at the apartment complex. She stated that she had seen the Defendant and Ms. Hill together at the apartment complex. She testified that after she and the other women ran past the police, the Defendant continued to move forward, but one of the officers "tased him . . . twice" and "then finally he fell to the ground." She said that at the moment the Defendant was tased, the crowbar "was still in his hand[,]" and he looked as if he was "[r]eady to use it."

Officer Loewen testified that after he returned to the apartment complex, his supervisor Sergeant Terrance Demarest, with the Metro Nashville Police Department, joined him, and they discussed "how to proceed to try to go find [the Defendant] because [they] felt that he might still be a threat to Ms. Hill." Officer Loewen explained that they remained at the complex until a family member arrived to stay with Ms. Hill. He stated that while they were waiting in the parking lot in their patrol cars, a second incident involving the Defendant occurred.

Officer Loewen explained that Ms. Hill and three other women ran screaming away from the apartment complex. He stated that the women were shouting "something along the lines of he's back. He is here. He has come after us[.]" Officer Loewen said that all four of the women "ran past us" and that he and Sergeant Demarest had "gotten out of [their] vehicles." He said that the women "ran right by us and that is when we saw [the Defendant] walking towards us with a large crowbar in his hand." When asked how the Defendant was holding the crowbar, Officer Loewen responded, "[H]e was holding it down at his side with just one hand . . . when we first saw him [and] as he approached us he started getting closer he raised the crowbar over his head, holding it with two hands, similar to how you would hold a baseball bat getting ready to swing[.]" Officer Loewen said that the Defendant was approximately "eight to ten feet" away from them when he raised the crowbar.

Officer Loewen testified that he took the following actions as the Defendant approached,

> When I saw [the Defendant] raise the crowbar above his head that is when I, I was fearful of what he was going to do with the crowbar, at which point I drew out my pistol and I directed him to stop, I gave him multiple verbal commands to stop, put the, put the crowbar down, to stop coming at us, to get on the ground, drop the weapon. I repeatedly gave those commands which he completely ignored. He just kept coming right at us.
>
> At that point, as he continued to approach us I was able to move to his side so that myself and the other officer weren't standing right sid[e]-by-side in front of him, trying to get a better angle to keep him from getting to the other, Ms. Hill and the other three that were with her.
>
> He continued to come at us with the crowbar over his head. He continued to ignore our verbal commands to stop, put the weapon down, so at which point I put my pistol up and pulled out my taser and I tasered him.

Officer Loewen agreed that he believed the Defendant was using the crowbar as a weapon and testified that he "was certain [the Defendant] was going to try to use [the

crowbar] on us. . . . I wouldn't say I was terrified, but I was very scared. I was definitely concerned for my safety at that point." He explained that he used a taser when there was "an active threat against" him and that this was "basically the step below deadly force." Officer Loewen stated that after he tased the Defendant, the Defendant fell to the ground, and Sergeant Demarest "put him in handcuffs."

He testified that during this time, he heard the Defendant make "several statements." He remembered the Defendant's repeating the phrases "[i]f I die you die" and "I'm going to kill you." Officer Loewen stated that he believed these statements were directed at Ms. Hill.

Sergeant Demarest testified that he remembered the incident that occurred in the early morning hours of June 24, 2014. He explained that he responded to a call for assistance from Officer Loewen at an apartment complex on Rosa L. Parks Boulevard. He continued that he had been at the complex for approximately "20 to 30 minutes" when he "started hearing people screaming[.]" He stated that he exited his patrol car and several women "came running from the stairwell area[.]" According to Sergeant Demarest, one of them was screaming, "There he is. There he is." He said that "the [Defendant] came running" toward them "carrying a large crowbar up over his head." He explained that the women ran past him into the parking lot and "were scared" and "were screaming at the top of their lungs." When asked to describe what happened next, Sergeant Demarest explained that

> [The Defendant] ran around . . . some vehicles parked in the parking spaces there as he came to the vehicles he was running at a swift pace and then he came to a sudden stop and then he started moving towards us again.

> At that point, I was at a gun point with him, because he had the crowbar placing me in fear for my safety and my partner also and not only that I was scared for the victims, but he had stopped for a second and he started advancing on me and I told him to stop, put the crowbar down. I repeated it multiple times to him, and he just ke[pt] screaming. He was not yelling at us. He was screaming at [the women].

Sergeant Demarest further explained that as the Defendant was holding the crowbar over his head, he was screaming at the group of women, "I'm going to kill you." Sergeant Demarest said that the Defendant was directing his comments "toward the group [of women,]" and he was "not sure if [the Defendant] was specifically screaming at Ms. Hill, but [Sergeant Demarest] assum[ed] he was." Officer Demarest said that the Defendant repeatedly "screamed [this phrase] at the top of his lungs." Officer Demarest explained that he was ready to use deadly force against the Defendant because "[h]e was

-12-

clearly a threat" to the officers and the victims and the Defendant was ignoring the commands from the officers. He explained that he believed Officer Loewen was in a position to successfully use a taser on the Defendant rather than lethal force. Thereafter, Officer Loewen deployed the taser; the Defendant fell to the ground; and Sergeant Demarest placed handcuffs on the Defendant. He said that as he was putting handcuffs on the Defendant, the Defendant repeatedly shouted, "If I die you die[.]"

After the State rested, counsel for the Defendant made a motion for a judgment of acquittal regarding Count 1 (aggravated assault by violating an order of protection), Count 2 (violation of an order of protection), and Count 4 (aggravated assault by using or displaying a deadly weapon), all involving Ms. Hill and the first incident on June 23, 2014. The trial court overruled the motion with respect to Count 1 and Count 2 and granted the Defendant's motion for judgment of acquittal as to Count 4. The trial court reasoned that the aggravated assault charged in Count 4 required that the Defendant cause Ms. Hill "to reasonably fear imminent bodily injury" and that Ms. Hill "was asleep and didn't even know that [the Defendant] was there."

The jury convicted the Defendant of six counts of aggravated assault (Counts 1, 6, 7, 8, 9, and 10), one count of attempted aggravated burglary (Count 5), and one count of violating an order of protection (Count 2). The jury found the Defendant not guilty of Count 3 regarding the aggravated assault against Ms. Simpson on June 23, 2014. The Defendant received a total effective sentence of eleven years, eleven months, and twenty-nine days to be served in confinement. The Defendant filed a timely appeal with this court.

## ANALYSIS

### I. Sufficiency

On appeal, the Defendant argues that the evidence was insufficient to support his convictions for three counts of aggravated assault. Specifically, he argues that the State failed to prove beyond a reasonable doubt that Ms. Hill's, Ms. Simpson's, and Ms. Armstrong's fear of imminent danger was reasonable regarding the second incident with the Defendant during the early morning hours of June 24, 2014. The State responds that the evidence was sufficient for the jury to find that the Defendant was guilty of aggravated assault of Ms. Hill, Ms. Simpson, and Ms. Armstrong. We agree with the State.

An appellate court's standard of review when the Defendant questions the sufficiency of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, a person commits assault who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily[.]" See Tenn. Code Ann. § 39-13-101(a)(2). Aggravated assault is defined as, "Intentionally or knowingly commit[ing] an assault, . . . and the assault involves the use or display of a weapon ." See Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii).

Here, there is sufficient proof to support the Defendant's convictions for aggravated assault against Ms. Hill, Ms. Simpson, and Ms. Armstrong on June 24, 2014. The Defendant intentionally moved towards the victims while carrying a large crowbar. As he got closer to the victims he raised the bar above his head. Additionally, the Defendant repeatedly shouted the phrase: "I'll kill you." Though this statement may have been directed specifically at Ms. Hill, she was in close proximity to the other two women. Furthermore, the Defendant was ignoring commands from two police officers who were prepared to use deadly force to stop the Defendant from advancing. Ultimately, Officer Loewen had to use a taser to subdue the Defendant, who fell to the ground and shouted, "If I die you die." Both Officer Loewen and Sergeant Demarest testified that they feared for their own safety and the safety of the four women as the Defendant approached them

-14-

carrying the crowbar. Each of the victims testified that they were afraid that the Defendant would harm them. Thus, there was sufficient evidence to support the Defendant's convictions for aggravated assault against Ms. Hill, Ms. Simpson, and Ms. Armstrong in Counts 6, 7, and 8.

## II. Admissibility of Prior Conviction

Additionally, the Defendant argues that his June 23, 2014 guilty plea for violating the order of protection in effect as of June 4, 2014, should not have been entered into evidence under Tennessee Rule of Evidence 404(b). He argues that the conviction was irrelevant and resulted in prejudice which constituted harmful error, requiring a reversal of all of his jury trial convictions. He contends that even if the testimony regarding his prior conviction was relevant, it should have been excluded because its probative value was outweighed by a danger of unfair prejudice. The State responds that the trial court did not abuse its discretion in finding that the Defendant's conviction for violating the order of protection was relevant to the Defendant's motive and intent in committing the offenses. We agree with the State.

Tennessee Rule of Evidence 404(b) provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). The term "other purposes" in the aforementioned rule, permitting evidence of a defendant's prior crimes, wrongs, or acts to be admitted, has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (citing

-15-

State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003)).

If a trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. Thacker, 164 S.W.3d at 240 (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. DuBose, 953 S.W.2d at 652.

Here, the trial court complied with all four necessary requirements. The trial court held a jury-out hearing to determine the admissibility of the Defendant's prior conviction for violating the order of protection. After hearing argument from the State and from counsel for the Defendant, the trial court made the following findings:

> I have heard your arguments and considered the issue that we had and reviewed the documents that have been filed and the [c]ourt is of the opinion that this prior conviction should be admitted in this matter.
>
> The [c]ourt finds that the evidence goes to motive and intent. I understand motive is not an element. I understand that, but it goes toward intent, and I think it is something that the [c]ourt is going to allow the jury to consider, especially the statement about "I told you I would get out,"[1] you know, I mean, it is all in the same day. Very same day, not the same week, but the same day.
>
> I understand the [c]ourt has got different ways they could prove about the order of protection, but I think this evidence is relevant on that issue, so I find that the proof of the prior convictions which is a violation of the order of protection, I find that that is going to be able to be shown by clear and convincing evidence from what I have heard in the arguments under the 404(b)(3).
>
> Th[ere] is really no dispute about that, that aspect of it anyway, so, finally, the court is of the opinion that the probative value is not outweighed by any unfair prejudice and the [c]ourt will instruct the jury as to how they

---

[1] We note that this phrase never appeared during trial testimony. However, we still believe that the evidence of the Defendant's conviction for violation of an order of protection was properly admitted.

-16-

are to consider this type of evidence, so that is the rule of the [c]ourt on this issue[.]

The trial court properly complied with the procedural requirements of Tennessee Rule of Evidence 404(b), and we agree that the evidence was relevant in establishing the Defendant's motive and intent. Evidence of the Defendant's conviction for a violation of the order of protection was relevant to show that the Defendant had motive or intent to harm the victim and that he knowingly violated the order of protection. See State v. Jameson Ross Owen, No. M2014-02394-CCA-R3-CD, 2015 WL 5461498, at *5 (Tenn. Crim. App. Sept. 18, 2015) (holding that Rule 404(b) evidence of the defendant's alleged history of stalking the victim at his trial for a violation of an order of protection was relevant to show the defendant's motive, relationship between the parties, and to show that the defendant acted knowingly in violating the order of protection). Traveling to the very location that was a subject of the order of protection the Defendant was convicted of violating just hours before was not done with innocent intent. The Defendant knew that he was ordered not to have any contact with the victim, but he went to her residence anyway. Furthermore, we hold that the probative value of this evidence was not outweighed by the danger of unfair prejudice. See id. (holding that the prejudicial impact of evidence of alleged stalking did not outweigh its probative value). Thus, we conclude that the trial court did not abuse its discretion in permitting the testimony under Rule 404(b) relative to the conviction for the order of protection.

### III. Relevancy of Officer's Testimony

Finally, the Defendant contends that the trial court erred in allowing Officer Loewen to testify regarding his opinion that Ms. Hill was "the most terrified" crime victim he had ever seen. He argues that this testimony was irrelevant under Tennessee Rule of Evidence 401; thus, the testimony should have been excluded in accordance with Tennessee Rule of Evidence 402, in the Defendant's opinion. He argues that Officer Loewen's testimony "served no purpose but to inflame the jury's emotions and sympathies toward Ms. Hill and invite them to speculate about matters unrelated to this case" and that the testimony was unfairly prejudicial. Accordingly, the Defendant contends that the trial court's error was not harmless and that the State "compounded the harmful effect of this error when it reminded the jury of [Officer] Loewen's testimony during closing argument." The State responds that the trial court properly allowed Officer Loewen to describe the victim's degree of fear. We agree with the State.

Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tennessee Rule of Evidence 402 states that "[e]vidence which is not relevant

is not admissible." Although relevant evidence is generally admissible, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[.]" Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

In response to the Defendant's objection to Officer Loewen's statement regarding Ms. Hill, the trial court allowed the testimony because it described the victim's "demeanor." We agree that the evidence is relevant to show that Ms. Hill was afraid of the Defendant and that she feared he would return and harm her after the first incident at the apartment complex. The Defendant had been charged with aggravated assault, and fear is an element of this crime. See Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii). Thus, Officer Loewen's testimony regarding Ms. Hill's degree of fear during the interim between the Defendant's two appearances at her apartment complexes was relevant, and the testimony's probative value was not substantially outweighed by unfair prejudice.

## CONCLUSION

Based upon consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE

-18-